# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 23-1060V

| | |
|---|---|
| STEVEN S. COHEN, <br><br> Petitioner, <br> v. <br><br> SECRETARY OF HEALTH AND HUMAN SERVICES, <br><br> Respondent. | Chief Special Master Corcoran <br><br> Filed: January 31, 2025 |

*Jimmy A. Zgheib, Zgheib Sayad, P.C., White Plains, NY*, for Petitioner.

*Nina Ren, U.S. Department of Justice, Washington, DC*, for Respondent.

### DECISION AWARDING DAMAGES[1]

On July 12, 2023, Steven S. Cohen filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") following an influenza vaccination he received on October 15, 2022. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters, and although entitlement was conceded in Petitioner's favor, the parties could not agree on the amount of compensation.

For the reasons described below, I find that Petitioner is entitled to an award of damages in the total amount of **$145,809.00,** comprised of $140,000.00 for actual pain and suffering, plus $5,809.00 in past unreimbursed medical expenses.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

### I.  Relevant Procedural History

Although Respondent conceded that Petitioner is entitled to compensation, the parties reached an impasse after brief discussions regarding damages. *See* ECF No. 25. Petitioner filed a Brief in Support of Damages ("Mot.") on March 5, 2024. ECF No. 25. Respondent filed a responsive brief ("Resp.") on April 18, 2024 and Petitioner filed a reply ("Repl.") on April 22, 2024. ECF No. 27-28. I subsequently proposed that the parties be given the opportunity to argue their positions at a "Motions Day" hearing, at which time I would decide the disputed damages issues. ECF. No. 29. That hearing was held on January 24, 2025,[3] and the case is now ripe for a written determination.

### II.  Relevant Medical History

Petitioner was 67 years old at the time he received a flu vaccine in his left arm on October 15, 2022 at a CVS pharmacy in Atlanta, GA. Ex. 2 at 5-7. He recalled having pain the same day as his vaccination, calling it "the most painful vaccination he had ever received." Ex. 3 at ¶5. He said he had hoped it would resolve with rest, Tylenol, and modified activities, but his pain gradually worsened over the next few days. *Id*.

On October 26, 2022 (11 days after vaccination), Petitioner called the nurse triage line at the office of his primary care provider ("PCP"). Ex. 4 at 102. He reported "excruciating pain" in his left upper arm and shoulder the night he received his flu shot and that he could not raise his arm due to pain. *Id*. The following day, Petitioner saw his PCP for "vaccine-related pain" that was keeping him up at night. *Id*. at 76-77. On exam, he had pain with both active and passive range of motion. *Id*. at 78. The doctor diagnosed SIRVA, ordered an MRI, prescribed diclofenac, and recommended physical therapy and evaluation by an orthopedist if the pain persisted. *Id.*

Petitioner saw an orthopedic physician's assistant on November 8, 2022. Ex. 5 at 83. He reported pain and limited range of motion (he was unable to raise his arm) since his flu shot 3 or 4 weeks ago. *Id.* On exam, he had severe difficulty and pain with drop arm testing and weakness and pain with supraspinatus testing. *Id*. at 84. His passive range of motion was within normal limits. *Id.* An MRI on November 16, 2022 revealed a rotator cuff tendinosis, several low-grade partial tears, bursitis, and likely labral degeneration. Ex. 5 at 85. On November 18, 2022, an orthopedist reviewed the MRI results and prescribed Tramadol. *Id*. at 2.

---

[3] At the end of the hearing held on January 24, 2025, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

Petitioner began physical therapy on December 1, 2022. Ex. 7 at 293. He reported getting a vaccination on October 15 and that it had "hurt significantly" ever since with pain rating between 4-7/10. *Id*. During the evaluation, he had diffuse pain, limited range of motion (both active and passive), and capsular tightness. *Id*. He attended 27 physical therapy treatments through April 26, 2023, with only minimal improvement. *Id*. at 166-292.

Petitioner followed up with the orthopedic physician's assistant on December 30, 2022. Ex. 5 at 80. He reported improvement with therapy and had improved range of motion. *Id.* He returned again on January 24, 2023, saying that while he initially felt like things were improving, now the "shoulder is progressing and more painful." *Id.* Surgery was recommended. *Id*. Petitioner saw an orthopedic surgeon on February 14, 2023, and that although surgery was originally scheduled for March 2023, he decided to exhaust all non-surgical options first. *Id.* at 5; Ex. 3 at ¶14.

Petitioner then sought treatment from a spine and pain management specialist. Ex. 6 at 29. He reported left shoulder pain that began after his vaccination, which he rated as severe without medications. *Id*. He was diagnosed with pain of the left shoulder and spinal enthesopathy (cervical region) and prescribed cyclobenzaprine. *Id*. at 31. Petitioner had a telehealth follow up with pain management on March 13, 2023, where he reported 8/10 shoulder pain and stated that he did not have full function of his arm. *Id*. at 26-28. He was advised to follow-up with his orthopedic surgeon regarding his shoulder. *Id*.

On April 14, 2023, Petitioner returned to his orthopedic surgeon reporting continued "significant pain." Ex. 5 at 10. He underwent arthroscopic surgery on May 3, 2023, which included: arthroscopic extensive debridement including lysis of adhesions, debridement of labral tear, synovectomy, debridement of partial-thickness rotator cuff attenuation, arthroscopic subacromial bursectomy and decompression, and manipulation under anesthesia. Ex. 5 at 38-39. Upon discharge, Petitioner was instructed to keep a sling on at all times and to "sleep in recliner position." Ex. 11 at 83.

Petitioner returned to physical therapy the day after his surgery. Ex. 9 at 86. He completed 21 sessions through September 5, 2023. *Id*. at 2-88. At his final treatment, he reported feeling much better, with only intermittent pain, had almost full range of motion (behind back was still limited a bit), and had 4+ strength. *Id*. at 4. His therapy goals were met and he was encouraged to continue his HEP to allow for further gains and "complete reduction in pain." *Id*. at 5.

Petitioner had follow-up appointments with his orthopedist on May 12, June 2, and July 12, 2023. Ex. 5 at 70-72; 93-96. At his final follow up on December 12, 2023, he

3

reported 98% improvement, with only minimal issues with internal rotation. Ex. 10 at 3-5. He was encouraged to continue his HEP. *Id*.

Petitioner states that he still has mild intermittent pain and limited mobility when reaching behind his back. Br. at 7.

### III.   The Parties' Arguments

Petitioner seeks an award of $160,000.00 for his pain and suffering. Br. at 1. In his brief and argument, Petitioner highlighted his high levels of pain, his consistent treatment for 14 months without gaps, and the extensiveness of his surgery. Br. at 11-12. Petitioner discussed prior SIRVA cases that involved injured claimants with awards ranging from $160,000.00 to $170,000.00, making his request reasonable. Br. at 10-11.

Regarding out-of-pocket expenses, Petitioner argued that he had provided documentation for all $8,184.23 requested. He explained that he purchased an adjustable bed base and recliner chair for $2,375.23. Br. at 13. Petitioner argued that the bed base and recliner were medically necessary because he was "instructed to sleep in a reclined position after surgery." *Id*.

#### a.   Respondent

Respondent proposes a pain and suffering award of $95,000.00 Resp. at 6. He characterizes Petitioner's SIRVA as "relatively mild" with "limited duration," "standard treatment," and "overall improvement of his injury." *Id*. Respondent also distinguishes Petitioner's cited prior SIRVA cases, noting that all of them had more treatment over much longer periods of time (even with some gaps). *Id*. at 7-9. Respondent also cited two prior SIRVA cases with awards between $95,000.00 and $97,500.00 to justify his proposed award. *Id*. at 9-10.

Respondent disputed some of Petitioner's out-of-pocket expenses, including $120.00 in specialist co-payments for orthopedist visits and $130.00 in payments for physical therapy. Resp. at 12. He further argued that Petitioner should not be compensated for the amount spend on an adjustable base bed or recliner chair because he "has not demonstrated that a recliner and adjustable bed is a reasonably necessary expense." *Id*. at 11. Specifically, Respondent argued that there was no recommendation in any medical record that petitioner purchase such equipment. *Id*.

4

### IV.     Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may also consider prior pain and suffering awards to aid in determining the appropriate amount of compensation for pain and suffering in a case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

5

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## V.     Prior SIRVA Compensation Within SPU[5]

### A.     Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2024, 4,138 SPU SIRVA cases have resolved since the inception of SPU ten years before. Compensation has been awarded in the vast majority of cases (4,016), with the remaining 122 cases dismissed.

2,308 of the compensated SPU SIRVA cases were the result of a reasoned ruling that the petitioner was entitled to compensation (as opposed to an informal settlement or concession).[6] In only 235 of these cases, however, was the amount of damages *also* determined by a special master in a reasoned decision.[7] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers

---

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[6] The remaining 1,708 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[7] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,044 cases) or stipulation (29 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

(the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[8]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

|  | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[9] Agreement |
|---|---|---|---|---|
| **Total Cases** | *235* | *2,044* | *29* | *1,708* |
| **Lowest** | $35,000.00 | $10,000.00 | $45,000.00 | $2,500.00 |
| **1st Quartile** | $67,910.00 | $60,539.19 | $90,000.00 | $35,000.00 |
| **Median** | **$85,920.03** | **$80,240.98** | **$130,000.00** | **$50,000.00** |
| **3rd Quartile** | $125,066.35 | $109,681.54 | $162,500.00 | $77,500.00 |
| **Largest** | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B.   Pain and Suffering Awards in Reasoned Decisions

In the 235 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $35,000.00 to $215,000.00, with $85,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[10] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[11]

---

[8] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[9] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[10] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[11] *Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A)); *see Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the application of the statutory cap before any projected pain and suffering award is reduced to net present value).

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In eight cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

## VI. Appropriate Compensation in this Case

a. Pain and Suffering

When determining the appropriate amount of compensation for a petitioner's pain and suffering, I review the entire record, including all filed medical records and affidavits and all assertions made by the parties in written documents and during oral argument. I also consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

In this case, there is no dispute of the Petitioner's awareness of his injury, and the parties generally agree on the course of treatment Petitioner that underwent. Petitioner sought treatment quickly – eleven days after his vaccination – for severe shoulder pain. Ex. 4 at 102. He had several medical visits with specialists, was prescribed medications for pain, had one MRI, and did 27 physical therapy treatments prior to his surgery. *See*

Ex. 5 at 85; Ex. 7 at 166-239. He had an extensive arthroscopic surgery approximately six months after vaccination. Ex. 5 at 38-39. After surgery, he had another 21 sessions of physical therapy, which led to a good recovery with only mild and intermittent ongoing symptoms. *See* Ex. 9 at 2-88; Ex. 10 at 3-5.

Respondent argues that Petitioner's injury and treatment was limited and that it resulted in a good outcome. Resp. at 6-7. To support his argument, Respondent relies primarily on *Shelton v. Secretary of Health and Human Services,* No. 19-0279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021) and *Hunt v. Secretary of Health and Human Services*, No. 19-1003V, 2022 WL 2826662f (Fed. Cl. Spec. Mstr. June 16, 2022), in which I awarded $97,500.00 and $95,000.00, for pain and suffering. Resp. at 9-10. But neither case is an appropriate comparison, because both involved significant unusual circumstances, such as lengthy gaps in treatment, that justified a lower award. There are no similar facts here.

At the same time, Petitioner argues that his SIRVA injury caused severe pain and range of motion limitations that required substantial treatment, including a more extensive surgery than in most similar SIRVA cases. The cases cited by Petitioner, while closer to the amount I award herein, involve petitioners who treated for far longer than did Petitioner. Further, two of the cited cases were from outside of the motion's day program within the Special Processing Unit, and therefore less helpful in this context.

I find Petitioner's situation to be most similar to the Petitioner in *McNabb v. Sec'y of Health & Human Servs.*, No. 19-1495V, 2022 WL 2398894 (Fed. Cl. Spec. Mstr. June 1, 2022) in which I awarded $125,000.00 in pain and suffering. The *McNabb* petitioner sought treatment 13 days after vaccination, reported severe pain, had one MRI, and did 15 sessions of physical therapy prior to surgery. *Id*. at *2-3. She had surgery approximately six months after vaccination. *Id*. at *3. She then had 43 physical therapy treatments after her surgery and made a strong recovery after about 16 months of treatment. *Id*. at *3-4. While the facts of the two cases are very similar, Petitioner reported higher levels of pain and had a more extensive surgery, justifying a somewhat higher award.

Overall, considering the arguments presented by both parties at the hearing, a review of the cited cases, and based on the record as a whole, I find that **$140,000.00** in compensation for past pain and suffering is reasonable and appropriate in this case.

    b. <u>Unreimbursed Expenses</u>

Vaccine Program petitioners may be awarded reasonably necessary actual unreimbursable expenses that were incurred by or on behalf of the person who suffered a vaccine injury. Section 15(a)(1)(B). Petitioner argues that he has paid $8,184.23 for

9

reasonably necessary medical expenses. Br. at 12. Petitioner's requested award includes $2,375.23 that was used to purchase an adjustable base bed and recliner chair that Petitioner used to sleep in a reclined position after his shoulder surgery. *Id*. at 12-13. Petitioner argues that the bed base and recliner were necessary because he was instructed to sleep in a reclined position after surgery. *Id*. at 13.

Respondent argues that Petitioner has not provided preponderant evidence for $120.00 in co-payments to Petitioner's orthopedist and $130.00 in physical therapy expense. Resp. at 12. Respondent further argues that Petitioner has not proven that his purchase of an adjustable base bed and recliner were reasonably necessary based on the medical records. *Id*. at 11-12.

I have reviewed the records filed by Petitioner. Respondent disputes Petitioner's co-payments for three specialist visits on February 22, 2023, March 13, 2023, and December 12, 2023. Resp. at 12. Petitioner's medical records corroborate payments of $40.00 each on February 22, 2023 and March 13, 2023. Ex. 6 at 33. Petitioner had an appointment with his orthopedist on December 12, 2023 and provided a handwritten note of the co-payment expense, but not a payment record (as Petitioner believed he had paid in cash). *See* Ex. 10 at 3-5; Ex. 12 at 29. Thus, Petitioner has provided preponderant evidence that he incurred and paid the $120.00 disputed by Respondent.

Respondent has not provided an explanation for the difference between his calculation and Petitioner's calculation of expenses for physical therapy. I have reviewed the physical therapy records and found that the records corroborate Petitioner's calculation. *See* Ex. 12 at 9-20. Further, Petitioner's records reveal that the expenses had been paid, evidenced by the notation that there was no outstanding balance as of December 2023. *Id*. at 21. Petitioner will be awarded the full amount requested amount.

Petitioner has not, however, sufficiently substantiated the purchase of an adjustable bed base and recliner chair as reasonably necessary medical expenses. Petitioner argues that his orthopedic surgeon instructed him to sleep in a reclined position after his shoulder surgery, but the only mention in the record of that recommendation is a short notation on a document regarding Petitioner's discharge from the hospital after surgery. *See* Ex. 11 at 89. To establish this kind of out-of-the-ordinary expense, more substantiation is required.

Accordingly, I award Petitioner **$5,809.00** as compensation for his past out-of-pocket expenses, calculated as the $8,184.23 that Petitioner requested minus $2,375.23, the cost of the adjustable bed and recliner.

**Conclusion**

In light of all of the above, I award **Petitioner a lump sum payment of $145,809.00, comprised of $140,000.00 for pain and suffering and $5,809.00 for past unreimbursed expenses, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner, Steven S. Cohen.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of Court is directed to enter judgment in accordance with this Decision.[12]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[12] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.